IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
------------

UNITED STATES OF AMERICA,

        Plaintiff,

v.

SCOTT PETER COULIER,

        Defendant.

_____/

Case No. 1:25-CR-148-002

Hon. Jane M. Beckering
United States District Judge

**DEFENDANT SCOTT COULIER'S SENTENCING MEMORANDUM**

On April 16, 2026, this Court will sentence Scott Coulier, following his guilty plea to one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349, a Class C felony. As set forth in greater detail below, Mr. Coulier's advisory guideline range – which is not in dispute – places him squarely within Zone A of the sentencing table, where a sentence of imprisonment is not required. U.S. Probation accordingly has recommended a non-custodial sentence of probation, an endorsement for which Mr. Coulier is grateful.

However, the government has moved for a two-level reduction in Mr. Coulier's offense level on account of his substantial assistance, which if granted would reduce Mr. Coulier's offense level to 5. Further, the crimes which gave rise to this case occurred five years ago, and over four years prior to Mr. Coulier's negotiated guilty plea. He has lived a law-abiding life and started over with his family since his involvement in the conspiracy. Where, as here, there is little to no punitive or corrective value in a sentence

1

of probation, and the sentencing guidelines do not require a minimum term of probation, the Court should sentence Mr. Coulier to a fine and restitution, with no probation or incarceration.

## BACKGROUND

In or about 2015, Mr. Coulier was involved in an online community that focused on earning a little extra money through "manufactured spending." (R. 50, Presentence Report ("PSR"), at ¶ 37). Manufactured spending is the practice of using a credit card that earns rewards to buy a cash-equivalent product that can be easily liquidated, such as a gift card. (*Id.*). The individual could thereby make a small profit on the credit card rewards. It was through this online group that Mr. Coulier met co-defendant Michael Goff. (*Id.*).

Shortly after meeting Mr. Goff, Mr. Coulier became aware of another profitable exchange opportunity promoted by a West Michigan retailer. (R.50, PSR at ¶ 40). Once every three months, the retailer offered customers enrolled in a loyalty program a $5.00 discount for all $50.00 worth of gift cards purchased, with a limit of $500.00 per member. (*Id.*). Mr. Coulier recognized that some gift cards can be resold online for nearly their full value. (*Id.* at ¶ 39). Recognizing the possibility of a windfall or "arbitrage opportunity," Mr. Coulier began purchasing $500.00 Best Buy gift cards for $450.00, making him a modest profit when they were later resold. (*Id.* at  40).

Mr. Coulier noted that, while the retailer's loyalty program was designed to be tied to a specific individual, there was no policy prohibiting the creation of multiple accounts. (R. 50, PSR at ¶¶ 11, 41). Of course, having multiple accounts would enable him

2

to bypass the $500.00 limit and resell as many cards as he had accounts. (*Id.* at ¶ 41). Mr. Coulier then manually created roughly 70 loyalty accounts, enabling him to earn a few thousand dollars in an afternoon when the gift card discount promotion ran every few months. (*Id.*). The online group eventually discovered that each loyalty account occasionally received complimentary coupons ranging from $5.00 to $10.00. (*Id.* at ¶42). Moreover, if the retailer offered a discount earned through entering a code, that code could be applied to all the loyalty accounts and result in a much more substantial windfall. That windfall, however, came at the expense of the retailer. While Mr. Coulier often felt uneasy, the lure of "free" merchandise – which he ultimately recognized, after it was too late, was in reality *stolen* merchandise – he willingly participated in the scheme.

Beginning in early 2021, another individual, Matthew McCord, who worked alongside Mr. Goff, developed a computer program to automatically create more loyalty accounts for the retailer and populate large numbers of coupons to the new accounts. (R. 50, PSR at ¶ 42). Mr. McCord also developed another program that constantly ran all potential discount codes through the retailer's website and, when successful, applied the discovered codes to all accounts. Mr. Goff then organized the "Heavy Hitters," a small online group that helped create and use these artificial accounts to redeem large numbers of coupons and invited Mr. Coulier. Mr. Coulier was wholly unaware of how this program worked or how it was developed. Mr. Coulier admitted to personally using the program once, but after forgetting how to operate it, a coconspirator simply provided him with the newly created accounts to use at the retailer. From then to about June 2021,

3

Mr. Coulier redeemed $10,000 to $20,000 in coupons through these accounts and mass-applied coupons.

ARGUMENT

**I.     The § 3553(a) Factors Support a Monetary Penalty or, at Most, a Non-Custodial Sentence**

When the Court sentences a defendant, it is asked to do more than impose a punishment—it must determine a sentence that is fair, measured, and no greater than necessary to serve the purposes of federal sentencing. *See* 18 U.S.C. § 3553. That task requires considering not only what happened, but why it happened, who committed the offense, and what response will best serve justice going forward.

**A.     Advisory Range and Zone A**

As a threshold matter, the Sixth Circuit has repeatedly upheld probationary sentences in guidelines Zone A cases where the sentencing court considered the § 3553(a) factors, including the nature of the offense, the defendant's background, acceptance of responsibility, and the absence of a need for imprisonment. *See United States v. Webb*, 739 F.3d 913, 916-917 (6th Cir. 2014) (affirming non-custodial sentence where advisory range was zero-to-six months and probation was within the zone of reasonable sentences under § 3553(a)); *United States v. Moulden*, 478 F.3d 652, 656-57 (6th Cir. 2007) (upholding district court's non-custodial sentence for defendant with minimal prior criminal history and mitigating personal factors despite guideline range recommending imprisonment); *United States v. Montgomery*, 578 F.3d 693, 705-06 (6th Cir. 2009) (affirming probation in a Zone A case where the defendant demonstrated acceptance of responsibility, and the sentencing court reasonably weighed statutory factors). These decisions recognize that

4

probation may be the appropriate sentence in Zone A cases, particularly when the defendant's history, characteristics, and personal circumstances support a non-custodial outcome.

However, a minimum term of probation is not *required* here. While USSG § 5B1.2 provides that when probation is imposed the term "shall be at least one year but not more than five years if the offense is level 6 or higher," the government has moved for a two-level reduction in Mr. Coulier's offense level. If the Court grants the motion, Mr. Coulier's offense level will be reduced to 5 and the guidelines will not require any minimum term of probation, or any term of probation at all.

### B.      Nature and Circumstances of the Offense

Mr. Coulier's conduct involved a determined financial loss of $20,000. Although this is not an insignificant amount of money, Mr. Coulier was committed to paying it back and has satisfied the restitution in full.[1]

Here, Mr. Coulier made the foolish choice to misuse a retailer's loyalty rewards program for modest financial gain, generally purchasing common household items. When others created force-multiplying applications that could take further advantage of weaknesses in the loyalty program, Mr. Coulier – without any understanding of how the applications worked – joined with others in taking advantage of the program to a degree that caused significant losses to the retailer.

---

[1]      When Mr. Coulier called to complete payment with the Clerk as ordered (R. 48), he was directed to make and made four separate payments of $5,000, satisfying the full $20,000 restitution.

The law enforcement operations that put an end to the conspiracy took place in June of 2021. Mr. Coulier – who had had very little experience with law enforcement – was devastated when his home was raided, and his young family was shocked and traumatized. On the advice of counsel, Mr. Coulier cooperated with law enforcement and disclosed all he knew of the conspiracy. While he maintained some contact with others had been involved over the years, he and his family were sufficiently shaken by the experience of the law enforcement raid on their home that they sold their house in Illinois and moved to Georgia to begin a new life together. Mr. Coulier lived with deep remorse for having caused his wife and children to experience the shock of the raid on their home but otherwise put the matter behind him.

It was not until four years later, in 2025, that the government determined the matter was not yet over and notified Mr. Coulier, through counsel, that charges would be presented to a Grand Jury if a pre-indictment resolution could not be reached. Mr. Coulier took responsibility for his previous unlawful agreement with the "Heavy Hitters" and pled guilty to conspiracy to commit wire fraud. While he is grateful for U.S. Probation's recommendation of a sentence of probation, he respectfully requests that the Court consider a sentence of monetary penalties only.

C.    History and Characteristics of the Defendant

Under § 3553(a)(1), the Court must consider the history and characteristics of Mr. Coulier. Here, Mr. Coulier has mitigating personal circumstances that strongly support a non-custodial sentence. Mr. Coulier is a stay-at-home father of two young children. His wife works outside the home and relies on Mr. Coulier as the primary caregiver. During

his presentence interview, Mr. Coulier admitted that he has not told his children about his current legal situation to protect them from undue stress. (R. 50, PSR at ¶ 108).

In addition to full cooperation with investigating agencies and the Government, Mr. Coulier has expressed sincere remorse for his actions.

> I am embarrassed of my actions... I have always had a well-paying career and lived a modest middle-class lifestyle… I am disappointed in myself that I did not trust my initial instincts that the situation might have evolved into something illegal. I let greed get the best of me and now I am paying the price for the rest of my life. (*Id.*, ¶ 74).

He goes on to say,

> I fully accept the consequences of my actions, and while I cannot undo the harm caused, I am committed to repaying Meijer and continuing to support my family as best as I can. I ask for understanding in the hope that my commitment to taking responsibility for my past mistakes will allow me to rebuild a future with my family, even as we continue to navigate the lasting impact of this situation. (*Id.*, ¶ 75).

> One of these "lasting impacts" is the effect on Mr. Coulier's family. Mr. Coulier's

wife, Yuan, is a lawful permanent resident. She was born in China and initially obtained a student visa in 2010 to complete her Master of Business Administration from Michigan State University. Yuan's parents still live in China, and the family is especially close with Yuan's mother. Following his plea, Mr. Coulier's passport was turned over to Probation, making any visits to China impossible. "[I] feel like I've been cut off from my extended family in China, potentially for life. My wife's family, especially her mother, is a significant part of our lives, and being unable to visit them will be devastating." (*Id.*).

### D.    The Need for the Sentence Imposed

When determining the need for the sentence imposed, the Court should factor, *inter alia*, just punishment and respect for the law, deterrence, and protection of the public. Here, Mr. Coulier's felony conviction, restitution, and public accountability provide an appropriate measure of punishment. As previously established, his genuine remorse and acceptance of responsibility demonstrate that specific deterrence has been achieved. In Zone A cases like *Webb* and *Montgomery*, the Sixth Circuit affirmed probation where there was no evidence that the defendant posed a continued risk to reoffend and where probation was consistent with deterrence objectives. Lastly, and maybe most importantly, Mr. Coulier is no threat to the public. The offense was non-violent, and at no point has Mr. Coulier proven himself to be a violent person or danger to society. Notably, Mr. Coulier's bond conditions did not include pretrial supervision, which one would expect if this Court had determined he was a danger to the public.

## II.    Cost Considerations Support a Monetary Penalty or, at Worst, a Non-Custodial Sentence

While cost alone cannot determine a sentence, it is a legitimate practical consideration under § 3553(a)'s mandate to impose a sentence that is sufficient but not greater than necessary. As outlined in the presentence investigation report, the average monthly cost of confinement in the Bureau of Prisons (BOP) is approximately $4,575.00 per inmate. By contrast, the average monthly cost of supervision by the United States Probation Office is approximately $519.00 per inmate. (R. 50, PSR at ¶147). Thus, a custodial sentence—even at the low end of the advisory range—would impose a cost

approximately ten times that of probation, without advancing any meaningful sentencing objective in this case.

In sum, since Mr. Coulier has already demonstrated in the years that passed between the investigation of this matter and the filing of charges that he is remorseful, reformed, and fully willing to make the retailer whole by the payment of restitution even before judgment is entered against him, there is little to no purpose to be served by Court supervision post-sentencing. He accordingly and humbly asks that the Court impose a sentence of monetary penalties only, with no probation or incarceration.

Respectfully submitted,

Dated: April 2, 2026

*/s/ Heath M. Lynch*
HEATH M. LYNCH
SBBL Law, PLLC
60 Monroe Ctr. St. N.W., Ste. 500
Grand Rapids, MI 49503
heath@sbbllaw.com
(616) 458-5500

9